IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE SILVERROCK DEVELOPMENT COMPANY, LLC, *et al.,* | : | Chapter 11 |
| | : | Case No. 24-11647 (MFW) |
| | : | (Jointly Administered) |
| Debtors. | : | |
| | | |
| CONSTRUCTION LOAN SERVICES II, LLC, | : | |
| | : | Civ. No. 25-1342-CFC |
| Appellant, | : | |
| v. | : | |
| | : | |
| SILVERROCK DEVELOPMENT, COMPANY, LLC, *et al.,* | : | |
| | : | |
| Appellees. | : | |

**MEMORANDUM**

This appeal arises in the chapter 11 cases of SilverRock Development Company, LLC ("Development") and certain of its affiliates (together, the "Debtors") in connection with the Debtors' sale of certain real property located in the City of La Quinta, California (the "City"). Before the Court is the emergency motion (D.I. 8) ("Stay Motion") of appellant Construction Loan Services II, LLC d/b/a Builders Capital ("Builders") seeking an order from this Court staying the effect of the Bankruptcy Court's October 23, 2025 Order (Bankr. D.I. 759)[1] ("Sale Order") which, among other things, approved the Debtors' sale of the real property to TBE RE Acquisition Co II, LLC ("Turnbridge") free and clear of all claims, liens,

---

[1] *In re SilverRock Development Co., LLC,* No. 24-11647 (MFW) (Bankr. D. Del.).

interests, and encumbrances, including free and clear of a ground lease between
Debtor Development and its affiliated Debtor SR Luxury Residences, LLC
("Luxury") in which Builders asserts it holds a real property interest. While
Builders has identified twenty-five issues on appeal (Bankr. D.I. 803), the Stay
Motion focuses on Builders' assertions that the Bankruptcy Court erred: (1) in
determining that section 365 of the Bankruptcy Code did not apply because the
ground lease was not a "true lease" but rather a financing instrument; and (2) erred
in determining that the Debtors satisfied their burden for a free and clear sale under
section 363(f) of the Bankruptcy Code.

In their oppositions, Turnbridge (D.I. 17) and Debtors (D.I. 19) both take the
position that Builders has failed to carry its burden of establishing any of the four
factors applicable to show that a stay of the Sale Order is warranted. The Debtors
have further filed the declaration of their Independent Manager, Christopher Sontchi
(D.I. 20), which sets forth: the difficulty the Debtors encountered in obtaining
funding for the chapter 11 cases; that the City ultimately provided $11,000,000 in
debtor-in-possession ("DIP") financing to fund the cases (*see* Bankr. D.I. 437) (the
"DIP Credit Facility");[2] that the DIP Credit Facility obligates the Debtors to comply
with certain affirmative and negative covenants (including case milestones); that the

---

[2] *See* Bankr. D.I. 437 (providing for a DIP Credit Facility in the maximum principal
amount of $11,000,000).

DIP Credit Facility matures in December 2025, at which point the Debtors will not have access to alternative funding absent the closing of the sale; and, finally, the harm to all parties in interest if the closing of the sale is delayed by this appeal beyond the applicable mid-December milestone, including the likely conversion of the chapter 11 cases to chapter 7 cases and the attendant loss of value to all creditors, including the City. *See id.* at ¶¶ 4-9. The Debtors and Turnbridge further assert that any stay of the Sale Order must be conditioned on Builders posting a substantial bond of $70 to $80 million to cover the lost purchase price, lost credits and other funding offered by the City, and the break-up fee that may ultimately be owed to Turnbridge, in addition to damages suffered by the City. *Id.* ¶ 10; D.I. 17 at ¶ 37.

The City has joined in these oppositions (D.I. 21) and filed the declaration of City Manager, Jon McMillen (D.I. 22), which sets forth the City's extensive efforts throughout the sale process to work with prospective purchasers to facilitate the re-entitlement of the real estate development project, to provide substantial financial incentives to the successful purchaser, and to provide for the eventual sale (or option to purchase) the City-owned portion of the property. *Id.* at 15. Among other things, the project, once completed, is expected to generate substantial tax revenue and tourism for the City. Absent a prompt closing on the sale, however, Turnbridge is

entitled to walk away from the sale,[3] thus a stay of the Sale Order imposes substantial risk of material economic loss to the City in an estimated amount of $10 million, including loss of tax revenue, tourism, and thousands of construction jobs, as well as the Debtors' lack of funds to repay their indebtedness to the City under the DIP Credit Facility. *Id.* at ¶¶ 19-29.

The Stay Motion is fully briefed. D.I. 8, 17, 19, 20, 21, 22. No party requested oral argument. At the urging of both Builders and the Debtors (*see* D.I. 8, 11), I have considered the Stay Motion on an expedited basis. For the reasons set forth herein, I will deny the Stay Motion.

## Background

The City is located in Riverside County, California, and has approximately 40,500 full-time residents. The City has been involved in the ownership and development of a real estate development project (the "Project") for more than 20 years, which consists of approximately 525 acres of real estate located within the City. The Project remains slated for the development of luxury hotel, residential, golf course, and related facilities, the completion of which is critical to the City. D.I. 22 at ¶ 5. In 2014, the City entered into a Purchase, Sale and Development Agreement ("PSDA") with Debtor Development. Under the PSDA, Development

---

[3] Although Turnbridge and the Debtors agreed to two brief extensions of the closing deadline, which passed on November 26, 2025, the extent to which either party can or will agree to further extensions is uncertain. *See* McMillen Decl. at ¶ 20.

committed to develop the Project, and the City conveyed 130 acres to Development.

As part of the Project, in simplest terms, Development leased 29 lots, upon which luxury residences were to be built, to Debtor Luxury pursuant to a 99-year "Triple-Net Ground Lease" (D.I. 8-3) (the "Ground Lease"). In exchange for $1.00 annual rent, Luxury agreed to be bound by the PSDA and to develop the 29 lots at Luxury's expense in accordance with the specifications approved by the City. The Ground Lease contemplated that Luxury would mortgage its tenancy interests. *Id.* § 1(viii) (defining "Lender"). Exhibit B to the Ground Lease sets forth the Lender's rights under the Ground Lease. *Id.* at Ex. B. By its plain terms, the Ground Lease is "essentially a financing device rather than a traditional operating lease." *Id.* ¶ 2(b).

In simplest terms, both Development and Luxury agreed not to terminate the Ground Lease without the Lender's consent, and gave the Lender the right to continue as tenant if Debtor Luxury's interests were terminated by sale, assignment, or transfer—which Builders refers to as its "pick up" rights. *Id.* at Ex B., ¶¶ 6-8. Development agreed that, in the event that Luxury rejected the Ground Lease, the Ground Lease shall "without any further act or action, automatically continue upon the same terms in favor of Lender as the lessee under the Lease provided that Lender immediately then cures or engages in good faith to cure any then existing default of [Luxury] under the [Ground Lease] which is reasonably susceptible of cure by Lender[.]" *Id.* § 6. As contemplated by the Ground Lease, Builders, as

4

Lender, loaned Luxury approximately $40 million, and Luxury granted Builders a first priority security interest in its interest in the Ground Lease.

Development commenced work on the Project, but it ultimately defaulted under the PSDA and ceased construction approximately three years ago. It appears undisputed that there are partially built structures on the Debtor-owned portion of the property, which have deteriorated over the course of the past three years. D.I. 22 ¶ 7. It appears further undisputed that the Ground Lease has long been in default: delinquent real property taxes are owed, the premises are not "in good condition free of accumulations of rubbish," mechanic's and other liens were filed against the premises and not discharged within 90 days, and the required $10 million sublimit insurance was not maintained. *See* D.I. 8-3 ¶¶ 5(a), 6, 8 & 9. Additionally, two "termination" defaults exist, each of which gives Development discretionary termination rights: (i) an "Abandonment Default" due to discontinuance of progress on the Project and the expiration of necessary permits to resume construction and (ii) the "PSDA Default" due to "[t]he failure of [Luxury] to comply with any and all aspects of the PSDA . . ." Id. at ¶¶ 20(c)-(d).

Various creditors of the Debtors commenced legal actions, including foreclosure proceedings. The Debtors filed their chapter 11 bankruptcy petitions on August 5, 2024 (the "Petition Date"). Thereafter, the Debtors and the City cooperated closely regarding marketing of the Property. After substantial marketing

and an auction, the Debtors selected Turnbridge as the successful bidder. On

August 15, 2025, the Debtors filed a motion (Bankr. D.I. 621) (the "Sale Motion")

seeking to (i) sell substantially all of their real property assets "free and clear" of all

liens, claims, and encumbrances pursuant to sections 363(b) and 363(f) of the

Bankruptcy Code to Turnbridge, and (ii) "consensually reject and voluntarily

terminate the Ground Leases." Builders objected.

On October 14, 2025, the Bankruptcy Court commenced a three-day hearing

to consider approval of the Sale Motion (the "Sale Hearing"). The Debtors

presented testimony that the Ground Lease provided no value to the Debtors' estates

and that its rejection, pursuant to section 365 of the Bankruptcy Code, was in the

best interests of the estates. The issue of whether the assets could be sold free and

clear of the Ground Lease under section 363 apparently did not arise until closing

arguments. Builders argued that even if both Debtors reject the Ground Lease,

Builders' "pick up" interest would remain unaffected. Each side accuses the other

of ambush. *See* D.I. 8 at ¶¶ 23-25; D.I. 17 at ¶ 22; D.I. 19 at ¶¶ 10-16. Indeed,

Builders acknowledged that it had failed to raise or brief this argument but argued

that it was unclear from the Sale Motion, which sought to reject or terminate the

Ground Lease, that the Debtors were also seeking to sell the assets free and clear of

its interests in the Ground Lease. *See* D.I. 8-10 ("10/17/25 Tr.") at 181.

At the conclusion of the Sale Hearing, the Bankruptcy Court ordered

simultaneous post-trial briefing regarding the issue.  Builders' supplemental brief

asserted numerous new arguments, including that, notwithstanding express language

providing that the Ground Lease was a financing instrument, the Ground Lease

created both a leasehold estate (held by Luxury/Builders) and reversionary estate

(held by Development):

> Under California law, Turnbridge can either purchase just the
> Reversionary Estate—and accept that it will have no possessory
> interests in the 29 Lots until the term of the [] Ground Lease expires—
> or it can purchase both the Leasehold Estate and Reversionary Estate
> together to obtain an immediate (and future) possessory interest.  There
> are no other options under California law due to the separateness of
> these interests.

(*See* Bankr. D.I. 744 at 2, 6-11.)  The Debtors' supplemental brief asserted multiple

arguments, including that (i) the Ground Lease was not a true lease but rather was,

by its plain terms, a financing instrument; (ii) even if it were a true lease, the

Debtors could still sell free and clear of the Ground Lease; (iii) the Ground Lease is

likely the product of an avoidable transaction giving rise to a *bona fide* dispute

under section 363(f)(4); (iv) Builders' alleged 'pick up rights" would violate the

automatic stay and/or are unenforceable *ipso facto* clauses under the Bankruptcy

Code; (v) any such rights are illusory since it is practically impossible for Builders

to cure the defaults or perform under the Ground Lease without incurring further

defaults; and (vi) Builders had previously waived all of these arguments.

Thereafter, the Bankruptcy Court issued its bench ruling.  *See* D.I. 8-11

("10/21/25 Tr."). The Bankruptcy Court determined that the Ground Lease was not

a true lease, but rather a financing agreement, thus section 365 was not applicable:

> To determine whether it's a financing instrument or a true lease [the] court must look at the circumstances and economic substance of the agreement to discern the true nature of the instrument regardless of what is called. California case law cited by the debtor generally considers a ground lease as a financing device for developing unimproved land and that is exactly the circumstances we have here. And the Second Circuit has similarly found ground leases were financing agreements, not true leases. The facts of this case support this conclusion. The lease, itself, says that it is essentially a financing device rather th[a]n a traditional operating lease . . . The rent is not market by any means. It's a dollar a year for 99 years regardless of what the market may charge for such bare ground, regardless of what risks, costs, expenses or revenues the property generates or may generate during the entire 99-year period. It's a triple net lease where the lessee bears all the costs of the property, but again, the landlord is getting nothing but a dollar a year. Consequently, the Court has to conclude that it is not a true lease but is a financing agreement.

(*Id.* at 4:5-25, 5:1-6.)

Turning to whether the sale could be approved under section 363(b),[4] the

Bankruptcy Court determined that the Debtors met their burdens under three

sections of 363(f)[5] with respect to Builders' interests, although it needed to find only

_____

[4] Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate…" 11 U.S.C. § 363(b)(1).

[5] Section 363(f) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if—

> (1) applicable nonbankruptcy law permits sale of such property free and clear of such interest;

one applied to approve the sale. *In re Kellstrom Industries, Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and any one of the five conditions are met, the debtor has authority to conduct the sale free and clear of all liens.")  Concluding that subsections (1), (4), and (5) of section 363(f) were satisfied, the Bankruptcy Court authorized the Debtors to sell the assets free and clear of all interests, liens, claims and encumbrances, including the Ground Lease. *See* 10/21/25 Tr. at 13:4-7.

**Jurisdiction**

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158.  District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees."  28 U.S.C. § 158(a)(1).  The Sale Order authorizing sale of the Debtors' property is a final, appealable order. *In re Culp,* 550 B.R. 683, 691 (D. Del. 2015).

**Discussion**

"The granting of a motion for stay pending appeal is discretionary with the court." *In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2-3 (Bankr. D. Del.

---

   …
   (4) such interest is in bona fide dispute; or
   (5) such entity could be compelled, in a legal or equitable proceeding,
   to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Mar. 27, 2001). "[A] stay of a Court's decision is an 'extraordinary remedy.'" *In re W.R. Grace & Co.*, 475 B.R. 34, 205 (D. Del. 2012) (citations omitted). "Irreparable harm is one of four factors relevant to the stay analysis." *In re Mallinckrodt PLC,* 2022 WL 1206489, at *1 (D. Del. Apr. 22, 2022). An applicant for a stay, however, "cannot succeed without showing that it will suffer irreparable harm absent a stay." *Id.* (citing *In re Revel AC*, 802 F.3d at 568). A harm is "irreparable" for stay purposes when it "cannot be prevented or fully rectified" by a successful appeal. *In re Revel AC*, 802 F.3d at 568 (quoting *Roland Mach. v. Dresser Indus.*, 749 F.2d 380, 386 (7ᵗʰ Cir. 1984)). Speculative harms are not enough: the movant "must 'demonstrate that irreparable injury is *likely* [not merely possible] in the absence of [a] [stay].'" *Id.* at 569 (emphasis in the original) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Moreover, the harm must be "more apt to occur than not." *Id.* Finally, "purely economic injur[ies], compensable in money," are also insufficient, except in those rare cases "where the potential economic loss is so great as to threaten the existence of the movant's business." *Id.* at 572 (quoting *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011)).

Builders asserts that it is unclear whether 363(m)[6] of the Bankruptcy Code

---

[6] Section 363(m) provides: "The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity

applies to its appeal, as Builders does not seek to invalidate the entire sale, but rather only to reverse or modify certain "free and clear" provisions of the Sale Order. D.I. 8 at ¶ 62. However, to the extent that section 363(m) does apply, Builders asserts that it "will be irreparably harmed [in absence of a stay] because closing of the sale will render its appeal statutorily moot." *Id.* Under Third Circuit precedent, while the potential for mootness is a factor that should be considered, it is not alone sufficient to justify a stay pending appeal. *See, e.g.*, *Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991) ("Certainly the fact that the decision on the stay may be dispositive of the appeal in some cases is a factor that an appellate court must consider, but that alone does not justify pretermitting an examination of the nature of the irreparable injury alleged and the particular harm that will befall the appellant should the stay not be granted."); *Winters Nursery LLC v. Color Spot Holdings, Inc. (In re Color Spot Holdings, Inc.)*, 2018 WL 3996938, at *3 (D. Del. Aug. 21, 2018) ("the possibility that an appeal may become moot does not constitute irreparable harm for purposes of obtaining a stay"). Were it otherwise, as the Debtors point out, a stay would be warranted for every sale order that is appealed based on section 363(m).

Builders argues that potential mootness is not the primary harm it will suffer

---

knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal." 11 U.S.C. § 363(m).

in absence of a stay of the Sale Order. Specifically, it says that it will be deprived of its "interests in and control of real property" subject to the Ground Lease, and that "[t]he loss of control of the land subject to the Ground Lease is not merely an economic injury." *Id.* D.I. 8 at ¶ 64. Builders essentially argues that were it not stayed from exercising its remedies under the loan documents pursuant to section 362 of the Bankruptcy Code, then it may attempt to exercise its contingent "step in" remedies as Lender. But Builders cites no case holding that secured lender remedies for real property liens are unique real property rights. And thus, I agree with the Bankruptcy Court that "a mortgage or a lien on real estate does not give the lender a real [property] interest in the real estate; rather, it gives the lender the right to be repaid the loan. So it is an economic interest." 11/13/25 Tr. at 25.

In sum, the potential harm cited by Builders is purely economic and does not warrant the extraordinary remedy of staying the Sale Order.

## Conclusion

Builders has failed to establish that it will suffer irreparable harm in absence of a stay. Accordingly, no further analysis is required. *In re Revel AC*, 802 F.3d at 571 ("If the movant does not make the requisite showings on either of these first two factors, the inquiry into the balance of harms and the public interest is unnecessary, and the stay should be denied without further analysis.") (cleaned up).

The Court will issue a separate Order consistent with this Memorandum..

December 5, 2025

_____
Colm F. Connolly
Chief Judge

13