# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SilverRock Development Company, LLC, *et al*., | Bankr. Case No. 24-11647 (MFW) (Jointly Administered) |
| Debtors. | |
| Construction Loan Services II, LLC, | |
| Appellant, | |
| v. | Civil Action No. 25-01342-CFC |
| SilverRock Development Company, LLC, *et al.,* | |
| Appellees. | |

## <u>APPELLANT'S OPENING BRIEF</u>

Dated: December 19, 2025
    Wilmington, Delaware

**POLSINELLI PC**
Shanti M. Katona (Del. Bar No. 5352)
Katherine M. Devanney (Del. Bar No. 6356)
Michael V. DiPietro (Del. Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com
kdevanney@polsinelli.com
mdipietro@polsinelli.com

*Counsel for Appellant Construction Loan Services II, LLC d/b/a Builders Capital*

107423518.15

## TABLE OF CONTENTS

I.     STATEMENT OF APPELLATE JURISDICTION......................................1

II.    STATEMENT OF ISSUES AND STANDARD OF REVIEW......................1

III.   STATEMENT OF THE CASE .................................................................2

    A.    FURTHER RELEVANT BACKGROUND .........................................3

        1.    The PSDA and the Development Project ...................................3

        2.    The Ground Lease........................................................................4

        3.    Appellant's Liens........................................................................6

        4.    The Sale Motion and Related Briefing ......................................7

        5.    The Sale Hearing, Supplemental Briefing, Bench Ruling, and
             Sale Order .................................................................................9

IV.    SUMMARY OF ARGUMENT...................................................................13

V.     ARGUMENT...............................................................................................14

    A.    The Bankruptcy Court erred in concluding that the Ground Lease is
        not a true lease....................................................................................14

        1.    The Bankruptcy Court's ruling that the Ground Lease is not a
             true lease was made in violation of Appellant's due process
             rights...........................................................................................16

        2.    The Ground Lease was not a fraudulent transfer.......................18

        3.    The Ground Lease is a true lease. .............................................20

        4.    The Bankruptcy Court's ruling creates a new class of disguised
             financing not found in the existing case law..............................24

    B.    The Bankruptcy Court erred in approving the Sale free and clear of
        Appellant's liens with respect to all 29 Lots....................................26

        1.    The Debtors must satisfy Section 363(f) with respect to each of
             the individual 29 Lots. ..............................................................27

i

ii

**2.**     The Debtors did not satisfy their burden under Section 363(f)(1) or (5)...................................................................................28

**3.**     The Debtors did not satisfy their burden under Section 363(f)(4). ...............................................................................37

**VI.**     Conclusion ...............................................................................41

107423518.15

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Flint Glass Workers Union v. Anchor Resolution Corp.*,
  197 F.3d 76 (3d Cir. 1999) ................................................................................2

*Bd. of Regents of State Colleges v. Roth*,
  408 U.S. 564 (1972)..........................................................................................16

*Boddie v. Conn.*,
  401 U.S. 371 (1971)..........................................................................................17

*Clear Channel Outdoor, Inc. v. Knupfer et al. (In re PW, LLC)*,
  391 B.R. 25 (B.A.P. 9th Cir. 2008) ..................................................................34

*Cleveland Bd. of Educ. v. Loudermill*,
  470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed. 2d 494 (1985) ............................16, 17

*In re Copeland*,
  238 B.R. 801 (Bankr. E.D. Ark. 1999)..............................................................23

*In re Daufuskie Island Props., LLC*,
  431 B.R. 626 (Bankr.D.S.C.2010).....................................................................27

*In re Dena Corp.*,
  312 B.R. 162 (Bankr. N.D. Ill. 2004) ...............................................................22

*Dishi & Sons v. Bay Condos LLC*,
  510 B.R. 696 (S.D.N.Y. 2014) ..........................................................................29

*In re Elieff*,
  Case No. SA CV 21-1720-DMG, 2022 WL 4484597 (C.D. Cal.
  Sept. 26, 2022) ............................................................................................39, 40

*In re Farina*,
  9 B.R. 726 (Bankr. D. Me. 1991) ......................................................................39

*In re Ferris Props., Inc.*,
  2015 WL 4600248 (Bankr. D. Del. 2015)....................................................30, 32

iii

*In re Haskell L.P.*,
  321 B.R. 1 (Bankr. D. Mass. 2005) .............................................................29, 30

*In re Integrated Health Servs.*,
  260 B.R. 71 (Bankr. D. Del. 2001).........................................................20, 21, 23

*In re Jaussi*,
  488 B.R. 456 (Bankr. D. Colo. 2013)...............................................................29

*Jiminez v. Tuna Vessel Granada*,
  652 F.2d 415 (5th Cir. 1981) .........................................................................17

*In re Johnson*,
  587 B.R. 195 (Bankr. M.D. Ga. 2018) ...............................................................8

*In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*,
  142 F.3d 631 (3d Cir. 1998) ............................................................................2

*In re Lansing Clarion Ltd. P'Ship.*,
  132 B.R. 845 (Bankr. W.D. Mich. 1991) .........................................................23

*In re Lykes Bros. S.S. Co., Inc.*,
  216 B.R. 856 (M.D. Fla. 1996)........................................................................15

*In re Mansaray-Ruffin*,
  530 F.3d 230 (3d Cir. 2008) ...........................................................................18

*Mullane v. Central Hanover Bank & Trust Co.*,
  339 U.S. 306 (1950)..................................................................................16, 17

*In re NJ Affordable Homes Corp.*,
  2006 WL 2128624 (Bankr. D.N.J. June 29, 2006).....................................39, 40

*In re PCH Associates*,
  804 F.2d 193 (2d Cir. 1986) ......................................................................25, 26

*Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Precision
  Indus., et al.)*,
  327 F.3d 537 (7th Cir. 2003) ..........................................................................15

*Prospect ECHN, Inc. v. Winthrop Res. Corp.*,
  569 F.Supp.3d 935 (D.Minn. 2021)................................................................15

iv

*Ramos v. Nielsen*,
    321 F. Supp. 3d 1083 (N.D. Cal. 2018)................................................................16

*In re Revel AC, Inc.*,
    802 F.3d 558 (3d Cir. 2015) ..............................................................................38

*In re Ricco, Inc.*,
    No. 10-23, 2014 WL 1329292 (Bankr. N.D. W.Va. Apr. 1, 2014)..............28, 29

*In re SCCC Assocs. II Ltd. P'Ship.*,
    158 B.R. 1004 (Bankr. N.D. Cal. 1993) ............................................................24

*In re Scott*,
    2013 WL 4498987 (Bankr. E.D. Ky. Aug. 21, 2013) ........................................29

*In re Sears Holdings Corp.*,
    No. 24-1354-BK, 2024 WL 5113165 (2d Cir. Dec. 16, 2024), *cert.*
    *denied sub nom. MOAC Mall Holdings LLC v. Transform Holdco*
    *LLC*, 145 S. Ct. 1931, 221 L. Ed. 2d 668 (2025).................................................11

*In re Showplace Square Loft Co., LLC*,
    289 B.R. 403 (Bankr. N.D. Cal. 2003) ..............................................................36

*In re Smith*,
    2014 WL 738784 (Bankr. D. Ore. Feb. 26, 2014)..............................................31

*In re Southland Royalty Co. LLC*,
    623 B.R. 64 (Bankr. D. Del. 2020) (KBO)........................................................38

*In re Spanish Peaks Holdings II, LLC*,
    872 F.3d 892 (9th Cir. 2017) .............................................................................15

*In re Stroud Wholesale, Inc.*,
    47 B.R. 999 (E.D.N.C. 1985).......................................................................38, 40

*In re Summit Global Logistics, Inc.*,
    2008 WL 819934 (Bankr. D.N.J. Mar. 26, 2008)..............................................27

*In re U.S. Metalsource Corp.*,
    163 B.R. 260 (Bankr. W.D. Pa. 1993)...............................................................34

*United Airlines, Inc. v. HSBC Bank USA, N.A.*,
    416 F.3d 609 (7th Cir. 2005) ..............................................20, 21, 24, 25, 26

v

*In re Urban Commons 2 West LLC*,
668 B.R. 42 (Bankr. S.D.N.Y. 2025)................................................29, 30, 33, 34

*Westship, Inc. v. Trident Shipworks, Inc.*,
247 B.R. 856 (M.D. Fla. 2000)..........................................................22, 23

*In re Wheeler Tech., Inc.*,
139 B.R. 235 (9th Cir. B.A.P. 1992) ...............................................................17

*In re Yost*,
54 B.R. 818 (Bankr. W.D. Ky. 1985)...............................................................23

**Statutes**

11 U.S.C. § 363(f)(1), (4), (5).............................................................27, 28

11 U.S.C. § 363(f)(1), (5) ...............................................................30, 31, 37

11 U.S.C. § 364...............................................................................33, 34

11 U.S.C. § 547..................................................................................37

11 U.S.C. § 548(a)(1)(A), (B)...................................................................19

11 U.S.C. § 550(b)(1)............................................................................19

28 U.S.C. § 158(a)(1)..............................................................................1

Bankr. Code § 363 ................................................................................34

Bankr. Code §§ 363 and 365......................................................................15

Bankr. Code §§ 363(b) and 363(f).............................................................7, 8

Bankr. Code § 363(f) ........................................ 12, 13, 14, 24, 26, 27, 28, 34, 37

Bankr. Code v 363(f)(1)........................................... 28, 31, 33, 34, 35, 37

Bankr. Code § 363(f)(4)............................................. 12, 19, 27, 37, 38, 39, 40, 41

Bankr. Code § 363(p)..............................................................................27

Bankr. Code § 365 ..............................................................................9, 15

Bankr. Code § 510(b).........................................................................39, 40

107423518.15

Bankr. Code § 550(a)(2) ...................................................................19

Cal. Civ. Code § 2903 ..................................................................32, 33

Cal. Civ. Code §3439.04 ................................................................19

Cal. Civ. Code § 8050 ....................................................................36

Cal. Civ. Code § 8450 ....................................................................36

**Court Rules**

Bankr. Rule 7001 ...........................................................................18

Bankr. Rule 9014 ...........................................................................18

Bankr. Rule 9014(c) ........................................................................18

Fed. R. Bankr. P. 7001 ...................................................................17

Bankr. Rules 7001 *et seq.* ...............................................................19

Fed. R. Bankr. P. 8002(a) ...............................................................1

Fed. R. Bankr. P. 8009 ...................................................................1

Local Bankr. Rule 6004-1(b)(iv)(M) ...............................................8

Local Bankr. Rule 8009-1.................................................................1

107423518.15

## I.    STATEMENT OF APPELLATE JURISDICTION

Appellate jurisdiction is proper under 28 U.S.C. § 158(a)(1) because this appeal (the "**Appeal**") concerns the following order entered by the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**") on October 23, 2025: *Order (I) Approving the Sale of Assets to the Successful Bidder Free and Clear of All Claims, Liens, Interests, and Encumbrances; (II) Approving the Consensual Termination or Rejection of Ground Leases, Effective as of the Closing Date; (III) Approving Form of Grant Deed; and (IV) Granting Related Relief* (the "**Sale Order**"). (A.2927).[1] Appellant timely filed its *Notice of Appeal* (A.3446) on November 3, 2025, pursuant to Rule 8002(a) of the Federal Rules of Bankruptcy Procedure (the "**Rules**"), and the *Appellant's Statement of Issues and Designation of Items to be Included in the Record on Appeal Pursuant to Federal Rule of Bankruptcy Procedure 8009 and Local Bankruptcy Rule 8009-1* (the "**Issues Statement/Designation**") on November 17, 2025.

## II.    STATEMENT OF ISSUES AND STANDARD OF REVIEW

The issues in the Appeal are set forth in the Issues Statement/Designation, but can be distilled down to the following:

---

[1] Citations to the Appendix to the Appellant's Opening Brief are designated as "A.[]," with the appropriate page number(s) supplied.

1

1.      Whether the Bankruptcy Court erred in denying Appellant its due process rights when it ruled that the Ground Lease was not a true lease.

2.      Whether the Bankruptcy Court erred in finding that the Ground Lease was not a true lease.

3.      Whether the Bankruptcy Court erred in approving the sale of the Debtors' assets free and clear of Appellant's liens.

On appeal, this Court reviews the Bankruptcy Court's findings of fact under the clearly erroneous standard and applies a plenary standard to the Bankruptcy Court's legal conclusions. *Am. Flint Glass Workers Union v. Anchor Resolution Corp.,* 197 F.3d 76, 80 (3d Cir. 1999) (citing *In re Krystal Cadillac Oldsmobile GMC Truck, Inc.*, 142 F.3d 631, 635 (3d Cir. 1998)).

## III.    STATEMENT OF THE CASE

Debtor SilverRock Development Corporation ("**Development**," and together with the debtors and debtors-in-possession in the captioned bankruptcy cases, the "**Debtors**") owns 29 parcels of real estate within a large, planned luxury development project (the "**29 Lots**").

In order to develop the 29 Lots into luxury residences, Development entered into the Ground Lease (as defined below) pursuant to which it leased all 29 Lots to Debtor SilverRock Luxury Residences LLC ("**Luxury**") for a term of 99 years and for a total rent of $99.00—*i.e.*, one dollar per year. Consistent with the Ground

2

107423518.15

Lease, the 29 Lots would either (a) be sold to third parties and released from the Ground Lease or (b) revert back to Development at the expiration of the Ground Lease.

Luxury, consistent with the terms of the Ground Lease, sought third party financing to be used to develop the 29 Lots. Construction Loan Services II, LLC d/b/a Builders Capital ("**Appellant**") made three loans to Luxury totaling in aggregate approximately $40,000,000 (the "**Loan**"), secured by, among other things, a first priority, perfected security interest in the leasehold estate created by the Ground Lease. Development guaranteed the Loan and granted a first priority interest on the fee simple for 13 of the 29 parcels (the "**Fee Property**").

Unfortunately, the development project collapsed and the Debtors filed for bankruptcy. Fourteen months later, the Debtors sought and obtained approval to sell all of their property, including the 29 Lots securing Appellant's Loan (the "**Sale**"), to TBE RE Acquisition Co II, LLC (the "**Purchaser**") free and clear of Appellant's liens.

### A.    FURTHER RELEVANT BACKGROUND

#### 1.    The PSDA and the Development Project

On November 19, 2014, the City of La Quinta, California (the "**City**") and Development entered into that certain *Purchase, Sale, and Development Agreement* (as amended, the "**PSDA**"). Through the PSDA, Development purchased raw land

3

(the "**Property**") from the City and agreed to develop the Property into a luxury living, golfing, and tourism destination consisting of, among other things, two hotels, a new golf course, a luxury spa, 55 lifestyle branded condominiums, and 29 high-end luxury branded residences (collectively, the "**Project**"). Given its size, different lenders loaned money to support the development of various components of the Project at different times. Appellant's interest in the Project is limited to those certain 29 luxury residential lots.

### 2.    The Ground Lease

On October 22, 2021, Development, as landlord, and Luxury, as tenant, entered into that certain 99-year *Triple-Net Ground Lease* (the "**Ground Lease**") for the 29 Lots. (A.37).

The Ground Lease did not allow for either Development, as landlord, or Luxury, as tenant, to finance the development of the 29 Lots. Instead, it expressly contemplated financing *from a third party* with any such financing secured by Luxury's interest in the Ground Lease in a manner consistent with the PSDA. (A.47, 51, Ground Lease, §§ 11,15).[2] Consistent with the Ground Lease, Luxury, for the

---

[2] The Ground Lease further contemplated that the applicable "Lender" would have certain rights under the Ground Lease. (A.39, Ground Lease § 1(viii) (defining "Lender")); Ground Lease, Ex. B (titled "Lender's Rights under the Lease"). Exhibit B to the Ground Lease provides the "Lender," as defined in the Luxury Ground Lease, with certain rights thereunder. (A.64-66). For example, Development agreed "for the benefit of Lender, not to accept a voluntary surrender of the Lease at any time which the Loan Documents remain in force." (A.66, Ground Lease, § 8). Development also agreed that, in the event that Luxury rejected the Ground Lease, the Ground Lease shall "without any further act or action, automatically continue upon the same terms in favor of Lender as the lessee under the Lease provided that

4

benefit of Development, borrowed money from Appellant to develop the 29 Lots. The Ground Lease explicitly provided that, at the termination of the Ground Lease, all 29 Lots (other than lots sold to *bona fide* third parties), including Improvements, would revert to Development, as landlord.[3] Thus, although Development only received $1 per year in rent, the Ground Lease was structured to require Luxury to develop the 29 Lots *for Development's exclusive benefit*.

On October 25, 2021, a Quitclaim Deed and Memorandum of the Ground Lease was properly recorded against the 29 Lots as Instrument No. 2021-0628129 in the Official Records for the County of Riverside (the "**Memorandum of Ground Lease**"). (A.23).

---

Lender immediately then cures or engages in good faith to cure any then existing default of [Luxury] under the [Ground Lease] which is reasonably susceptible of cure by Lender[.]" (A.65, Ground Lease, Ex. B, §6). Notably, the Lender's "pick-up rights" were further detailed in § 7 of Exhibit B to the Ground Lease, which obligated Development to execute a new ground lease for the remaining term in the event that Luxury's interests under the Ground Lease were terminated by sale, assignment, or transfer. (A.65-66, Ground Lease, Ex. B, § 7). These "pick-up" rights are significant as they demonstrate the direct flow of rights and obligations from Development to the Lender (as defined in the Ground Lease) under the express terms of the Ground Lease. *See id.*

[3] A.52, Ground Lease, § 18 ("Tenant agrees that at the expiration of this Lease, it will deliver to Landlord peaceable possession of the Premises (expressly excluding the Released Parcels)."); A.51, Ground Lease,§ 16 ("All of the Improvements shall be and remain the property of Tenant during the Term and shall become the property of Landlord upon expiration of the Term."); A.40, Ground Lease,§ 1(xi) ("Portions of the Premises are to be improved with residential dwelling units. … [U]pon the sale of the subject residential units to third party buyers …  the residential unit legal lot which is the subject of such sale … shall be released from the Deed of Trust and this Lease ….").

5

### 3.    Appellant's Liens

Immediately after the Ground Lease was recorded, Poppy Bank (the "**Bank**") loaned Development $40,000,000 and recorded a deed of trust against the 29 Lots as instrument No. 2021-0628130 in the Official Records for the County of Riverside (the "**Bank DOT**").[4] (A.9). Although the Bank DOT was recorded shortly after the Ground Lease, the Bank did <u>not</u> take a security interest in Luxury's rights under the Ground Lease. *See id.* In fact, Luxury is not even a grantor under the Bank DOT, and therefore could not have granted the Bank any of its rights under the Ground Lease. *See id.*

On November 28, 2022, in connection with the Loan, Appellant recorded three deeds of trust against the 29 Lots as Instrument Nos. 2022-0482451, 2022-0482683, and 2022-0482949 in the Official Records for the County of Riverside (collectively, the "**Appellant DOTs**"). (A.74, A.103, A.133). Under the Appellant DOTs, Appellant obtained a first-priority security interest in all of Luxury's interests under the Ground Lease with respect to all 29 Lots and became the "Lender" under the Ground Lease. (A.76, A.105, A.135, Appellant DOTs, § 1.1.1 and Ex. A-1, A-2); (A.39, Ground Lease, ¶1(viii) (defining "Lender" as "any Approved Institution which is the holder of debt from Tenant secured by an interest in the Leasehold

---

[4] Partial reconveyances relating to thirteen of the 29 Lots were subsequently recorded.

107423518.15

Estate or any Improvements, fixtures or equipment on the Premises.")). Additionally, under the Appellant DOTs, Appellant obtained a first-priority security interest in the Fee Property. (A.100, A.130, A.159).

Accordingly, under the terms of the Ground Lease, the Loan, the Bank DOT, and the Appellant DOTs, Appellant was entitled to receive first dollars—before payment to the Bank, the Debtors, or any other party—from any sale of any of the 29 Lots.

### 4.    The Sale Motion and Related Briefing

On August 15, 2025, the Debtors filed the *Debtors' Motion for Entry of an Order (I) Approving the Sale of the Purchased Assets to the Successful Bidder Free and Clear of All Claims, Liens, Interests, and Encumbrances; (II) Approving the Consensual Termination or Rejection of Ground Leases, Effective as of the Closing Date; (III) Approving Form of Grant Deed; and (IV) Granting Related Relief* (the "**Sale Motion**"). (A.771). Through the Sale Motion, the Debtors sought to (i) sell substantially all of the Property free and clear of all liens, claims, and encumbrances pursuant to Sections 363(b) and 363(f) of the Bankruptcy Code to the Purchaser (who was designated as the Stalking Horse Bidder in the Sale Motion), and (ii) "consensually reject and voluntarily terminate the Ground Leases," including the Ground Lease. (A.795).

7

Notably, these were two entirely separate requests for relief. The Debtors did **not** ask to sell the Property free and clear of the Ground Lease or any other leasehold interests pursuant to Sections 363(b) and 363(f).[5] (A.771). The **only** proposed treatment of the Ground Lease in the Sale Motion was the Debtors' request to "consensually reject and voluntarily terminate"—a legal impossibility since a debtor no longer has any ability to terminate a lease once it has been rejected. *Id. See also, e.g.*, *In re Johnson*, 587 B.R. 195, 198 (Bankr. M.D. Ga. 2018) ("Rejection of a lease results in abandonment and removes the lease from the bankruptcy estate.").

On September 5, 2025, Appellant objected to the Sale Motion (the "**Sale Objection**"). (A.1317). Because the Debtors had not requested authority to sell the Property free and clear of the Ground Lease, Appellant did not address so-called "lease stripping" in the Sale Objection. *Id*. Instead, it responded to the Debtors' vague request to "reject and voluntarily terminate" the Ground Lease, and sufficiently reserved all rights to raise further or subsequent issues. *Id*.

Over a month later, on October 8, 2025, the Debtors filed an omnibus reply in support of the Sale Motion (the "**Reply**"). (A.1350). In the Reply, the Debtors reiterated their request to "consensually reject or voluntarily terminate the [Ground

---

[5] Rule 6004-1(b)(iv)(M) of the Local Rules of the United States Bankruptcy Court for the District of Delaware requires debtors seeking to sell property free and clear of a "possessory leasehold interest, license or other right" to highlight such provisions in the sale motion. Because they were only seeking to reject and/or terminate the Ground Lease, and not sell free and clear of it, the Debtors did not comply with this rule.

8

Lease.]" (A.1389). The Debtors explained that the Ground Lease was, "at bottom, [an] unexpired lease[] of nonresidential real property within the meaning of section 365 of the Bankruptcy Code." (A.1391).

Nowhere in the Sale Motion or Reply did the Debtors suggest that the Ground Lease was not a "true lease." Nor did they implicitly or explicitly suggest that the Ground Lease was the result of a fraudulent conveyance.

### 5. The Sale Hearing, Supplemental Briefing, Bench Ruling, and Sale Order

On October 14, 2025, the Bankruptcy Court commenced a three-day hearing to consider approval of the Sale Motion (the "**Sale Hearing**"). During closing arguments, Appellant argued that the Debtors could not use Section 365 of the Bankruptcy Code to strip Appellant's lien against the Ground Lease or otherwise deprive Appellant of its security interest against the Ground Lease.

In response, Debtors argued that they were, first, "rejecting" the Ground Lease under Section 365 of the Bankruptcy Code and, second, agreeing amongst themselves to "terminate the lease after it's been rejected as the Bankruptcy Code permits." (A.2075, Oct. 17 Tr. 181:11-12). In sum, the Debtors argued that rejection under Section 365 coupled with post-rejection termination by the Debtors terminated the Ground Lease and stripped Appellant of all rights as "Lender" under the Ground Lease and as a fully secured party on the leasehold created by the Ground Lease,

9

107423518.15

which otherwise would have guaranteed Appellant first dollars from any sale of the 29 Lots. (A.2073-75, Oct. 17 Tr. 179:12-181:13).

At the conclusion of the Sale Hearing, the Bankruptcy Court ordered Appellant and the Debtors to submit simultaneous post-trial briefing regarding the Ground Lease. (A.2081, cited herein as the "**Appellant's Brief**"; A.2101, cited herein as the "**Debtors' Brief**," which together with Appellant's Brief comprise the "**Supplemental Briefing**").

While lengthy, the Debtors' Brief barely addresses the narrow issue for which the Bankruptcy Court requested post-trial briefing. (A.2101). Instead, the Debtors argued for the first time that they could sell free and clear of the Ground Lease because: (i) the Ground Lease was not a "true" lease, and (ii) the Ground Lease was itself a fraudulent conveyance under California law. *Id*. ***Again, the Debtors' Brief was the first time that the Debtors asserted either of these claims, and because the Bankruptcy Court ordered simultaneous briefing, Appellant did not have the opportunity to respond to the Debtors' newly asserted arguments.***

The Debtors' new assertion that the Ground Lease was not a true lease is entirely inconsistent with the terms of the Ground Lease, case law, and numerous previous positions that the Debtors took in the chapter 11 cases. For example:

- The amended schedules filed by Development and Luxury list the Ground Lease on Schedule G, which discloses all of these entities' respective leases. (A.1202, A.1267).

10

- The Debtors obtained a debtor-in-possession loan from the City that primed Appellant's security interests up to $1,000,000 with respect to the leasehold interests. (A.597). The City's priming lien was the subject of extensive negotiations among all parties, and at no time did the Debtors (or any other party in interest) ever suggest that the Ground Lease was not a true lease. *See id*.  To the contrary, the Ground Lease was collateral upon which the City demanded—and received—a priming lien. *Id*.

- The Debtors filed three motions to extend the deadline by which they were to assume or reject unexpired leases of non-residential real property, and noted in each motion that their ground leases, including the Ground Lease, were "key components of the Project".and that they "may be critical to a going-concern sale process." (A.305, 307). These motions would have been entirely unnecessary if the Ground Lease was not a true lease. *See In re Sears Holdings Corp.*, No. 24-1354-BK, 2024 WL 5113165, at *3 (2d Cir. Dec. 16, 2024), *cert. denied sub nom. MOAC Mall Holdings LLC v. Transform Holdco LLC*, 145 S. Ct. 1931, 221 L. Ed. 2d 668 (2025) ("We agree with the district court that Section 365(d)(4) does not apply to the MOAC Lease because it is not a 'true lease.'").

Similarly, the Debtors' belated claim that the Ground Lease constitutes a fraudulent conveyance—raised for the first time 14 months into the chapter 11 cases—is highly suspect given that the Debtors filed a number of other adversary proceedings early in the chapter 11 cases, and yet never filed an action to undo or even address this alleged fraudulent conveyance.[6] In fact, the Debtors have proffered no evidence supporting their allegations, and have not filed an adversary proceeding

---

[6] *See, e.g.*, Adv. Case No. 24-50261; Adv. Case No. 25-50389; Adv. Case No. 25-50450; Adv. Case No. 25-50950; Adv. Case No. 25-51049; Adv. Case No. 25-51201.

11

107423518.15

relating to the Ground Lease or the interests and liens granted pursuant thereto. (A.2101).

On October 21, 2025, after the parties submitted the Supplemental Briefing, the Bankruptcy Court, with no response from Appellant and without any evidentiary record to support the Debtors' new arguments, issued a bench ruling finding, among other things, (i) that the Ground Lease was not a "true lease" and (ii) the Debtors' argument that the Ground Lease could be avoided as a fraudulent transfer created a *bona fide* dispute for purposes of Section 363(f)(4) of the Bankruptcy Code, granting the Sale Motion, and approving the Sale to the Purchaser (the "**Bench Ruling**," which begins at A.2135).

After the Bench Ruling, the Debtors circulated to Appellant a revised proposed form of order approving the Sale. *See Certification of Counsel* (A.2156). Appellant informally objected to this proposed form of order because it contained findings that were not made at the Bench Ruling and were not supported by evidence admitted at the Sale Hearing, including specific findings under Section 363(f) with respect to each of the 29 Lots. *See id*. As the Debtors indicated, the parties were unable to reach a resolution on this issue, and the Debtors submitted the proposed order to the Bankruptcy Court notwithstanding Appellant's objection. (A.2157).

On October 23, 2025, the Bankruptcy Court entered the Sale Order in the form requested by the Debtors over Appellant's objection.

12

## IV.    SUMMARY OF ARGUMENT

In approving the Sale, the Bankruptcy Court erred in three primary ways. First, based on arguments raised for the first time by the Debtors in supplemental briefing requested by the Bankruptcy Court at the conclusion of the Sale hearing, the Bankruptcy Court found that (a) the Ground Lease was a financing agreement and not a "true lease" and (b) there was "some evidence" that Development did not receive reasonably equivalent value from Luxury that the Ground Lease was potentially a fraudulent conveyance. Appellant had no opportunity to respond to these arguments, nor was any evidence tendered to the Bankruptcy Court to support any finding of lack of "reasonably equivalent value." In ruling without allowing Appellant to respond to the Debtors' arguments, the Bankruptcy Court violated Appellant's due process rights.

Second, the Bankruptcy Court's ruling that the Ground Lease was not a "true lease" was in error. In so ruling, the Bankruptcy Court incorrectly applied the test for determining whether the Ground Lease was a true lease or disguised financing and its ruling was unsupported by the factual record.

Third, the Bankruptcy Court found that Section 363(f) of the Bankruptcy Code was satisfied with respect to each of the 29 Lots, even though the evidence admitted at the Sale hearing does not support this conclusion. Because the Bankruptcy Court found the Ground Lease was not a true lease, it did not determine

13

whether Section 363(f) authorized the Debtors to sell the 29 Lots free and clear of any claims under the Ground Lease (as opposed to Appellant's claims against the Fee Property).

The Debtors, relying on the Bankruptcy Court's flawed ruling, have taken the position that Appellant has no security interest in the Ground Lease and no security interest in the proceeds of the Sale attributable to the leasehold interests in the 29 Lots. Consequently, the Debtors have proposed to allocate only approximately $400,000 to Appellants from the proceeds of the Sale[7]—a recovery of less than 1% on Appellant's $40,000,000 secured claim. (A.3971) Although the Bankruptcy Court did not rule on this issue, the Debtors' proposed allocation of proceeds from the Sale assumes that Appellant has no interest in the Leased Property or the proceeds generated from the sale of the Leased Property.

## V.   ARGUMENT

### A.   The Bankruptcy Court erred in concluding that the Ground Lease is not a true lease.

The Bankruptcy Court incorrectly ruled that the Ground Lease is not a true lease with no briefing or argument from Appellant. In so doing, the Bankruptcy Court entirely avoided critical legal questions regarding (i) the intersection of

---

[7] This allocation remains ongoing in the Bankruptcy Court, and Appellant reserves all rights with respect thereto.

14

Sections 363 and 365 of the Bankruptcy Code,[8] and (ii) whether debtors sitting on both sides of a lease may reject the lease or unilaterally terminate it in a way that injures a third party with an interest in that lease.

Accordingly, for the reasons set forth below, this Court should reverse the Bankruptcy Court's ruling that the Ground Lease is not a true lease and remand to the Bankruptcy Court to determine whether the Ground Lease must be rejected under Section 365 of the Bankruptcy Code.

But even if this Court agrees with the Bankruptcy Court that the Ground Lease is not a true lease, this issue should still be remanded to the Bankruptcy Court for a determination as to the nature of Appellant's interest in the Ground Lease and the basis for selling the 29 Lots free and clear of that interest. Under existing case law, if the Ground Lease is not a true lease, then Luxury owns the 29 Lots. *See, e.g., In re Lykes Bros. S.S. Co., Inc.*, 216 B.R. 856, 866 (M.D. Fla. 1996) (noting support in case law for proposition that "if a transaction is a disguised financing transaction, the purported lessee is the true owner of the 'leased' property and that status relates back to the inception of the transaction."). Development, as lessor, has at most, an unrecorded security interest in the 29 Lots. *See Prospect ECHN, Inc. v. Winthrop Res. Corp.*, 569 F.Supp.3d 935, 939 n.1 (D.Minn. 2021) ("If the Lease Agreement

---

[8] *See, e.g., In re Spanish Peaks Holdings II, LLC*, 872 F.3d 892 (9th Cir. 2017); *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC (In re Precision Indus., et al.)*, 327 F.3d 537 (7th Cir. 2003).

15

and Lease Schedules are recharacterized as secured transactions, the 'lessor' would be considered the 'secured party' and the lessee the 'debtor/obligor.'). As such, Appellant's recorded security interest would have priority over this unrecorded interest. Nevertheless, the Bankruptcy Court never reached this issue, which is of critical importance in determining the proper allocation of the Sale proceeds.

> **1.    The Bankruptcy Court's ruling that the Ground Lease is not a true lease was made in violation of Appellant's due process rights.**

Appellant's interest in the Ground Lease is a property interest that is protected by the Fourteenth Amendment. *See Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1121 (N.D. Cal. 2018) ("To constitute a protected property interest, an individual must have 'more than an abstract need or desire' or 'unilateral expectation' for a benefit, but rather a 'legitimate claim of entitlement' based on, inter alia, 'existing rules or understandings that stem from an independent source such as state law,' a 'statute defining eligibility,' a contract 'creat[ing] and defin[ing]' certain terms, or some other 'clearly implied promise.'") (quoting *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 576-78 (1972)).

"An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542, 105 S. Ct. 1487, 1493, 84 L. Ed. 2d 494 (1985) (quoting *Mullane v. Central Hanover Bank &*

16

*Trust Co.*, 339 U.S. 306, 313 (1950)). The Supreme Court has "described the "root requirement" of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" *Id.* (quoting *Boddie v. Conn.*, 401 U.S. 371, 379 (1971)) (emphasis in original). Such notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane*, 339 U.S. at 314.

Yet, neither the Debtors nor the Bankruptcy Court provided Appellant with <u>any</u> notice that the characterization of the Ground Lease was in dispute. *See Jiminez v. Tuna Vessel Granada*, 652 F.2d 415, 420 (5th Cir. 1981) ("[E]ach party is entitled to know what is being tried, or at least to the means to find out. Notice remains a first-reader element of procedural due process, and trial by ambush is no more favored here than elsewhere."). Appellant never had an opportunity to respond to the Debtors' "true lease" argument, which they raised for the first time in simultaneous post-trial briefing. *See In re Wheeler Tech., Inc.*, 139 B.R. 235, 239 (9th Cir. B.A.P. 1992) ("Basic notions of due process require that parties be apprised of any action against them and that they be allowed a reasonable opportunity to respond.").

Moreover, Rule 7001 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") required the Debtors to bring an adversary proceeding to determine the "validity, priority, or extent" of Appellant's interest in the Ground

17

Lease. *See In re Mansaray-Ruffin*, 530 F.3d 230, 237-38 (3d Cir. 2008) (noting that creditor had the "legal right to do nothing and insist upon being served with a summons and a complaint in order for its lien to be invalidated."). This cannot be construed as an oversight or a technical violation of the Bankruptcy Rules. "Where the [Bankruptcy Rules] require an adversary proceeding—which entails a fundamentally different, and heightened, level of procedural protections—to resolve a particular issue, a creditor has the due process right not to have that issue resolved without one." Even contested matters brought pursuant to Bankruptcy Rule 9014 provide procedures for responses and discovery. *See* Bankruptcy Rule 9014(c). Indeed, Rule 9014 expressly incorporates many of the same rules applicable to adversary proceedings. *See id*. Regardless, Appellant never waived its rights under Bankruptcy Rule 7001 or the related procedural safeguards that come with an adversary proceeding.

### 2.    The Ground Lease was not a fraudulent transfer.

In the Debtors' Brief, the Debtors suggested, for the first time and without any evidence, that the Ground Lease constituted a fraudulent transfer. The Debtors' entire fraudulent transfer argument was premised on conjecture and speculation. (A.2110-2113, Debtors' Brief, ¶¶ 16-19) Nevertheless, the Bankruptcy Court noted during the Bench Ruling that the Debtors' unsupported insinuation that the Ground

18

Lease was a fraudulent transfer created a *bona fide* dispute for purposes of Section 363(f)(4), discussed further in Section V.B.3, below. (A.2146, Ruling Tr. 12:6-14).

To be clear, the Debtors proffered no evidence during the Sale Hearing suggesting that the Debtors' entry into the Ground Lease was an intentional attempt to hinder, delay, or defraud creditors, or that there was a lack of reasonably equivalent value provided. *See* 11 U.S.C. § 548(a)(1)(A), (B); Cal. Civ. Code §3439.04. This alone should end the Debtors' fraudulent transfer argument.

But even if they had submitted evidence demonstrating that the Ground Lease was a fraudulent transfer, there is still no evidence in the record supporting any conclusion that Appellant's interest in the Ground Lease could be avoided under Section 550(a)(2) of the Bankruptcy Code. There is no evidence suggesting that Appellant (x) did not take for value, (y) did not act in good faith, or (z) had knowledge of the avoidability of the Ground Lease. *See* 11 U.S.C. § 550(b)(1).

Moreover, as noted above, any action to invalidate Appellant's liens would need to be brought through an adversary proceeding, which affords Appellant additional due process and procedural safeguards. *See* Bankruptcy Rules 7001 *et seq.* Because no adversary proceeding has been commenced against Appellant and there is no evidence supporting any fraudulent transfer theory against Appellant, the Bankruptcy Court erred in relying on the Debtors' fraudulent transfer allegations in concluding that the Ground Lease was not a true lease.

19

### 3.    The Ground Lease is a true lease.

"Whether a 'lease' is [a] true or bona fide lease or, in the alternative, a financing 'lease' or a lease intended as security, depends upon the circumstances of each case." *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 614 (7th Cir. 2005) (quoting S.Rep.No. 989, 95th Cong., 2d Sess. 64 (1978)). "In determining whether an agreement is a true lease or a disguised financing agreement, the majority of courts focus upon three factors: whether the lessee has a purchase option at the end of the lease and, if so, whether the option price is nominal; whether the aggregate rental payments have a present value equal to or in excess of the original cost of the leased property; and whether the lease term covers the useful life of the property." *See In re Integrated Health Servs.*, 260 B.R. 71, 76 (Bankr. D. Del. 2001) (citations omitted).

In addition, courts look to "whether the 'rental' payments were calculated to compensate the lessor for the use of the property, rather than ensure a return on an investment; whether the 'rent' was calculated at market rate; whether the obligations of the tenant are those normally associated with ownership; whether the property was purchased by the lessor specifically for the lessee's use; and the intent of the parties, including whether the agreement was structured to secure tax advantages and the purpose of the lease in light of the entire transaction." *Id.* The distinction between a true lease and a disguised financing depends on the "economic

20

107423518.15

substance," rather than the form or name of the transaction. *United Airlines*, 416 F.3d at 614.

The Debtors have the burden of proving that a lease is disguised financing rather than a "true lease." *Id.*, at 75 ("The party challenging the bona fides of the lease carries a 'substantial' burden of proof.") (citation omitted). Here, and as set forth above, none of the elements of a disguised financing is present. Development, as landlord, retains all right, title, and interest in and to the 29 Lots and the 29 Lots revert to Development at the end of the term unless sold to a third party. The rental payments—$1.00 per year—in no way "have a present value equal to or in excess of the original cost of the leased property." Nor was the Property purchased for the use of Luxury, as tenant. Finally, and importantly, under the Ground Lease, neither Development nor Luxury provided any financing whatsoever—all financing came from Appellant over one year after Luxury and Development entered into the Ground Lease. It is axiomatic that a lease that provides absolutely no financing, disguised or otherwise, cannot be a financing instrument.

Instead, Development leased undeveloped land to Luxury, whose task it was to develop the Property in accordance with the greater Project while also obtaining the third-party financing necessary to complete such development. It would be an economic absurdity to expect Luxury to pay a rental price based on the as-developed value of the land while simultaneously overseeing and financing that development.

21

This is particularly true where, as here, the developed property reverts to the lessor at the end of the lease term. (A.51-52, Ground Lease, ¶ 16) Thus, the economic reality of the legal relationship between the parties confirms that the primary consideration supporting the Ground Lease was Luxury's role in developing the Property, not the mere payment of rent. Accordingly, and for the reasons described in greater detail below, the Ground Lease is a true lease. Otherwise, it is difficult to imagine any scenario where a lessee could finance and develop a property without being subject to a similar attack—regardless of whether the landlord is in bankruptcy.

*First*, the Ground Lease unambiguously preserves Development's substantial reversionary estate and provides that all Improvements (as defined in the Ground Lease) become Development's property upon expiration of the lease term. (A.38, A.51-52, Ground Lease, ¶¶ 1, 16). This is a bedrock feature of true leases, and places the Ground Lease in stark contrast to other arrangements that have been determined to be a disguised financing. *See, e.g., In re Dena Corp.*, 312 B.R. 162, 169 (Bankr. N.D. Ill. 2004) ("There cannot be a true lease where the 'lessor' has no ownership interest at the end of the lease term."); *Westship, Inc. v. Trident Shipworks, Inc.*, 247 B.R. 856, 863 (M.D. Fla. 2000) ("[T]he most significant factor in determining whether a transaction is a lease or a sale is whether the lessor has retained a residual

22

107423518.15

interest at the end of the lease term.") (citing *In re Copeland*, 238 B.R. 801, 804 (Bankr. E.D. Ark. 1999)).

*Second*, the Ground Lease contains no purchase option. Instead, it expressly provides for the reversion of all the 29 Lots and Improvements to Development at its expiration. The absence of such a purchase option weighs strongly in favor of characterizing the Ground Lease as a true lease. *See Integrated Health Servs.* at 76 (concluding that lease was true lease under Texas law where, as here, agreement contained no purchase option).

*Third*, the Ground Lease has condemnation and casualty provisions that first allocate to Development the fair market value of the Premises and Development's reversionary interest, with only the remainder (if any) being allocated to Luxury. (A.50, Ground Lease, ¶¶ 13(e), (f)) This is also consistent with a bona fide landlord-tenant relationship. *See, e.g.*, *In re Yost*, 54 B.R. 818, 819 (Bankr. W.D. Ky. 1985) (finding lease to be true lease where lessee was required to keep equipment insured against risk of loss and deliver insurance policies to lessor).

*Fourth*, the fact that the Ground Lease is a ninety-nine year, triple-net lease that obligates Luxury to pay all costs and expenses associated with the Premises is not determinative, as "a triple net lease is not an unusual term in a true lease." *Integrated Health Servs.* at 77 (citing *Westship v. Trident Shipworks*, 247 B.R. 856, 863 (M.D. Fla. 2000); *In re Lansing Clarion Ltd. P'Ship.*, 132 B.R. 845, 852 (Bankr.

23

W.D. Mich. 1991)). *See also In re SCCC Assocs. II Ltd. P'Ship.*, 158 B.R. 1004, 1013 (Bankr. N.D. Cal. 1993) ("The fact that the Agreement has a potential term of ninety-nine years does not remove the Agreement from the definition of a lease.").[9]

### 4. The Bankruptcy Court's ruling creates a new class of disguised financing not found in the existing case law.

The Debtors have not identified a single case where the type of arrangement between Development and Luxury was found not to be a true lease. Instead, they rely primarily on two Court of Appeals cases that concluded that financing arrangements were not true leases, neither of which is applicable to the Development/Luxury relationship. First, *United Airlines, Inc. v. HSBC Bank USA, N.A.*, 416 F.3d 609, 616 (7th Cir. 2005) involved a series of "complex transactions" involving the airline that were designed to finance improvements at four airports. *United Airlines*, 416 F.3d at 610. In that case, United entered into a sublease and leaseback arrangement with the California Statewide Communities Development Authority ("**CSCDA**") in connection with the CSCDA's issuance of $155 million of bonds for United's benefit. *Id.* at 611. United subleased 20 acres of its maintenance base to CSCDA for 36 years (which coincided with its bond repayment schedule)

---

[9] During their closing rebuttal argument at the Sale Hearing, the Debtors stated for the first time that they intended to sell the Property free and clear of the Ground Lease pursuant to Section 363(f). (A.2073, Oct. 17 Tr. 179: 14-17) However, the Debtors never proffered any evidence or argued during the Sale Hearing, or during closing, that Section 363(f) was satisfied with respect to the Ground Lease. Accordingly, there is no basis for a sale of the Property free and clear of the Ground Lease.

for total rent payments of $1.00. *Id*. Simultaneously, the CSCDA leased those same 20 acres back to United in exchange for rent equal to interest on the bonds plus an administrative fee. *Id*. The lease contained a $155 million balloon repayment at the end of the 36 year period, and also a "hell or high water" clause that obligated United to pay the rent even if it cannot use or derive economic benefit from the maintenance base. *Id*. at 611-12.

Second, the Debtors rely on *In re PCH Associates*, 804 F.2d 193 (2d Cir. 1986), which involved a "sale-leaseback arrangement for tax and investment advantages" that was "sharply tailored by sophisticated parties." *PCH*, 804 F.2d at 194. In that case, the ownership of a hotel and the land upon which it sat was severed to meet the business objectives of various stakeholders. *Id*. at 194-95. The land, but not the hotel, was sold to an entity and immediately leased back to the seller under a 33-year lease with a $600,000 annual minimum rent subject to adjustment based on the hotel's performance or in the event the "Landlord's Investment" fell below a certain threshold. *Id*. at 195.

But the relationship between Development and Luxury is not a lease-leaseback or a sale-leaseback. Development provided Luxury with absolutely no financing—disguised or otherwise. While it is true that Luxury did ultimately collateralize its leasehold interest, that financing was provided by Appellant, a third-party lender. *See United Airlines*, 416 F.3d at 617 ("We do not doubt that many

25

financing devices are true leases…"). This was not a sophisticated, highly-structured transaction like in *United Airlines* or *PCH* that was designed to effectively transfer the 29 Lots from Development to Luxury. Luxury leased the 29 Lots from Development for the purpose of developing them, with the unambiguous understanding that Development would get the 29 Lots back at the end of the lease term, unless individual developed lots were sold in the interim. (A.40, Ground Lease, ¶ 1(xi) (removing individual parcels from the definition of "Premises" as they are developed and sold)).

Affirming the Bankruptcy Court's ruling would create an entirely new class of disguised financing that simply does not exist in the established "true lease" case law. Appellant respectfully submits that such a ruling would disrupt the bargained-for business expectations of countless real estate developers who rely on ground leases to secure third-party financing in connection with their development projects. Accordingly, the Court should reverse the Bankruptcy Court's finding that the Ground Lease is not a true lease.

### B. The Bankruptcy Court erred in approving the Sale free and clear of Appellant's liens with respect to all 29 Lots.

Section 363(f) of the Bankruptcy Code allows a debtor to sell property free and clear of any interest in such property of an entity other than the estate if: "(1) applicable nonbankruptcy law permits the sale of such property free and clear of such interest;. . . (4) such interest is in bona fide dispute; or (5) such entity could be

26

compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f).

The Sale Order contains boilerplate recitations that Sections 363(f)(1), (4), and (5) were satisfied with respect to each of Appellant's 29 Lots. (A.3215-3427, Sale Order, Ex. 2, 3) However, the Bankruptcy Court's findings with respect to most of the 29 Lots are wholly unsupported by the evidence admitted at the Sale Hearing. With respect to the remaining lots, the Bankruptcy Court erroneously held that purely hypothetical foreclosures, receivership actions, and inchoate mechanic's liens could satisfy Section 363(f) as a matter of law, and with no evidence that any such creditor was willing or able to act against Appellant's collateral.

### 1. The Debtors must satisfy Section 363(f) with respect to each of the individual 29 Lots.

There is no question that it is the Debtors' burden to prove that Section 363(f) is satisfied. *See In re Summit Global Logistics, Inc.*, 2008 WL 819934, at *9 (Bankr. D.N.J. Mar. 26, 2008).[10] But it is not enough that the Debtors prove, in a general

---

[10] During the Bench Ruling, the Bankruptcy Court suggested that Appellant had an obligation under Section 363(p) of the Bankruptcy Code with respect to Section 363(f)(4): "The objectors assert that the only dispute in that is the priority of the secured liens, but I believe that priority is a bona fide dispute, and that the language of (f)(4) is not limited to a bona fide dispute as to the validity of the claim, and this is particularly so because Section 363(p) mentions priority and validity as items for which the creditors bear the burden of proof to oppose sales free and clear under 363(b)." (A.2146, Ruling Tr. 12:16-23) To the extent the Bankruptcy Court placed any burden on Appellant with respect to Section 363(f), such burden-shifting also constitutes error. *In re Daufuskie Island Props., LLC,* 431 B.R. 626, 637 (Bankr.D.S.C.2010) (burden is on sale proponent to prove applicability of one or more provisions of Section 363(f)).

27

sense, that they have met their obligation. Instead, they must prove that Section 363(f) is satisfied with respect to each of the individual 29 Lots. *See In re Ricco, Inc.*, No. 10-23, 2014 WL 1329292, at \*2 (Bankr. N.D. W.Va. Apr. 1, 2014) ("Notably, [the] successful bid was for the three parcels as a bundle. For the sale of the bundle to be free and clear of liens, the court must approve the sale of each parcel free and clear of liens under § 363(f).").

Indeed, Section 363(f) of the Bankruptcy Code authorizes the Debtors to sell property free and clear of "an interest in *such* property" in three circumstances applicable to this Appeal: (1) applicable nonbankruptcy law permits the sale free and clear of *such interest*…,(4) *such interest* is in bona fide dispute, or (5) the entity holding the interest could be compelled to accept a money satisfaction of *such interest*. 11 U.S.C. § 363(f)(1), (4), (5) (emphasis added). The statute does not authorize the Debtors to sell the entirety of Appellant's collateral free and clear of Appellant's liens simply because the Debtors may be able to satisfy Section 363(f) with respect to one or some of the 29 Lots. To the extent that Section 363(f) was not satisfied with respect to a particular lot, as described more fully below, that lot cannot be sold free and clear under the Bankruptcy Code.

### 2. The Debtors did not satisfy their burden under Section 363(f)(1) or (5).

Courts have interpreted Bankruptcy Code section 363(f)(1) narrowly to include only applicable nonbankruptcy law pursuant to which a debtor, rather than

28

a third party, might utilize to sell property of the estate free and clear of a lien or interest. *See Dishi & Sons v. Bay Condos LLC*, 510 B.R. 696, 710 (S.D.N.Y. 2014) (citing *In re Jaussi,* 488 B.R. 456, 458 (Bankr. D. Colo. 2013)) (holding that the phrase "applicable nonbankruptcy law" could not be interpreted broadly to include state mortgage foreclosure law, but instead referred to law that allowed an owner of the asset to sell free and clear of interests in that asset.).

Courts have also interpreted Section 363(f)(5) in an analogous manner, limiting the scope of that provision only to "those scenarios where the trustee or debtor, not any third party, is the actor." *Dishi*, 510 B.R. at 711 (citing *Ricco*, 2014 WL 1329292, at *3; *In re Scott*, 2013 WL 4498987, *2-3 (Bankr. E.D. Ky. Aug. 21, 2013); *In re Haskell L.P.*, 321 B.R. 1, 9 (Bankr. D. Mass. 2005). Accordingly, most courts have flatly rejected attempts by debtors to expand Section 363(f)(5) to include "any hypothetical action a third party might take that would compel interest holds to accept a money satisfaction, including the government's taking of property by eminent domain." *In re Urban Commons 2 West LLC*, 668 B.R. 42, 48 (Bankr. S.D.N.Y. 2025).

Instead, the *Urban Commons* bankruptcy court analyzed Section 363(f)(5) under a "realistic possibility" standard. *See id*. Under this approach, Section 363(f)(5) encompasses "not any conceivable hypothetical proceeding that might compel interest holders to accept a money satisfaction, but only proceedings that

29

might realistically be brought in the case before the court if the automatic stay were lifted or did not apply." *Id. See also In re Ferris Props., Inc.*, 2015 WL 4600248, at *2 (Bankr. D. Del. 2015) ("[T]he sale proponents must do more than show that it is theoretically possible to compel a creditor to accept a money satisfaction under section 363(f)(5)."); *Haskell,* 321 B.R. at 8-9 ("[T]he Court rejects the Debtor's argument that it need only show that it is theoretically possible to compel a party to accept a money satisfaction of its interest and that the possibility of an eminent domain taking satisfies § 363(f)(5).").

Exhibit 2 to the Sale Order states that Sections 363(f)(1) and (5) are satisfied with respect to Appellant's collateral because "foreclosure by senior liens including tax liens and priming DIP liens of City of La Quinta on same parcel." (A.3232). Additionally, while not in the Sale Order, the Bankruptcy Court noted at the Bench Ruling that sub-sections (f)(1) and (5) were satisfied because the Debtors cited "numerous statutes and case law in California that [] permit[s] an entity to sell free and clear of a senior creditor's lien, [and] a junior creditor's lien." (A.2145, Ruling Tr. 11:9-12). These statutes include "receiverships, foreclosure actions. . . and mechanic's lienors who also can force a sale free and clear of the rights of other secured creditors." *Id.* at 11:13-16. The Bankruptcy Court correctly noted that there was an existing pre-petition action by a mechanic's lien holder, but did not

30

acknowledge that that proceeding only pertained to eight of Appellant's 29 Lots. *Id.* at 11:16-18; (A.163, UCS Complaint (defined below)).

> **a)    A foreclosure by a junior lienholder cannot satisfy Sections 363(f)(1) or (5) with respect to a senior creditor's liens as a matter of law.**

The Bankruptcy Court's statements suggest that it concluded that sub-section (f)(5) was satisfied, in part, because creditors junior to Appellant could foreclose Appellant's lien. To the extent that this was the Bankruptcy Court's ruling, such ruling was incorrect because "the rights of a senior lienholder are generally not affected by the foreclosure of a junior lien interest." *In re Smith*, 2014 WL 738784, at \*2 (Bankr. D. Ore. Feb. 26, 2014) (rejecting trustee's argument that Section 363(f)(5) could be satisfied with respect to a senior creditor where trustee would be bringing foreclosure action as a junior lien creditor pursuant to Section 544(a)(1)). Thus, a foreclosure by a creditor junior to Appellant could not, as a matter of law, either (i) result in the sale of Appellant's collateral free and clear in satisfaction of Section 363(f)(1), or (ii) compel Appellant to accept a monetary satisfaction for its senior lien. *See* 11 U.S.C. § 363(f)(1), (5). In such a scenario, Appellant's liens would ride through the foreclosure unaffected. *See Smith*, 2014 WL 738784 at \*2.

> **b)    There is no senior lienholder that can realistically foreclose against Appellant's collateral.**

Exhibit 2 to the Sale Order identified only two possible foreclosures that could satisfy Sections 363(f)(1) and (5), both by senior lienholders: (i) a foreclosure by the

31

City, as debtor-in-possession financing lender (in such capacity, the "**DIP Lender**") and certain unidentified "senior liens including senior tax liens." (A.3232).

*The tax liens*. The only evidence of tax liens against the 29 Lots consists of three proofs of claim filed by the Riverside County Treasurer (the "**Taxing Authority**") that are secured solely by the Taxing Authority's statutory lien for unpaid property taxes. (A.268, A.274, A.280). There is no evidence that the Taxing Authority took any action pre-petition to enforce its lien, or that it could or would take any action to foreclose over a year into the chapter 11 cases.

And even if it did, Appellant would still have the right to redeem the outstanding taxes before any foreclosure was completed. Cal. Civ. Code § 2903 ("Every person, having an interest in property subject to a lien, has a right to redeem it from the lien, at any time after the claim is due, and before his right of redemption is foreclosed . . ."). Here, the Taxing Authority's filed proofs of claim (A.268, A.274, A.280) reflect relatively small claims compared to the value of Appellant's collateral, increasing the likelihood that Appellant would exercise its redemption rights and prevent any foreclosure from ever occurring.

Thus, all the Debtors have proven is that it is theoretically possible for the Taxing Authority to foreclose against Appellant's collateral, which is not sufficient. *See Ferris Props.* at *2. Nor could it be, since real estate taxes are typically billed in arrears and are therefore *always* accruing. At any given moment, a property has

32

unpaid property taxes simply because such taxes have not yet been billed. To allow the mere existence of these taxes to satisfy Sections 363(f)(1) or (5) would improperly render these provisions meaningless with respect to real property collateral. The Debtors did not prove, and the Bankruptcy Court did not find, that there was a realistic possibility that the Taxing Authority could or would bring a foreclosure action against the 29 Lots.

*The priming DIP*. Section 363(f)(1), by its terms, only applies to applicable non-bankruptcy law. By contrast, a debtor-in-possession loan ("**DIP Loan**"), and the rights and remedies created pursuant thereto, arise, by definition, pursuant to bankruptcy law. *See, e.g.*, 11 U.S.C. § 364. The DIP Loan was created pursuant to the Bankruptcy Code only after approval by the Bankruptcy Court. (A.422, A.597). Because there can be no DIP Loan without a bankruptcy filing, Section 363(f)(1) cannot apply. Nor can the Debtors rely on Section 363(f)(5). There had been no default under the DIP Loan, and there was no possibility that the DIP Lender would seek to foreclose against Appellant's collateral. Indeed, the DIP Lender is situated much differently than the lender in *Urban Commons*, who had a pending pre-petition state court foreclosure suit. *See Urban Commons* 668 B.R. at 48. And, even if the DIP Lender did seek to foreclose, Appellant would still have redemption rights under California law. Cal. Civ. Code § 2903. Given the relatively small ratio between the priming portion of the DIP Loan amount and Appellant's claim ($1 million versus

33

$40 million), Appellant would have every incentive to exercise its redemption right to preserve its collateral.

But more fundamentally, if a hypothetical foreclosure by the holder of a priming DIP Loan can satisfy Section 363(f)(1) or (5), then Section 363(f) will be satisfied *ab initio* in every case where there is a priming DIP Loan. Even worse, priming DIP Loans are often approved on the "first day" of the chapter 11 case, often with no notice to creditors. *See In re U.S. Metalsource Corp.*, 163 B.R. 260, 266 (Bankr. W.D. Pa. 1993) ("First day orders are extraordinary orders that are generally issued without the normal debate and examination given to ordinary matters."). Allowing a priming DIP Loan to satisfy Section 363(f) would improperly give all debtors who obtain a priming DIP Loan an automatic right to sell their property free and clear of liens without any consideration of the other factors set forth in Section 363(f)—a result never contemplated in either Section 364 or Section 363 of the Bankruptcy Code. *See, e.g.*, *Clear Channel Outdoor, Inc. v. Knupfer et al. (In re PW, LLC)*, 391 B.R. 25, 43 (B.A.P. 9th Cir. 2008) (adopting a reading of Section 363 that gives meaning to all provisions and does not render any sub-part superfluous); *Urban Commons*, 668 B.R. at 48 (same).

> c)    **The mechanic's lien evidence admitted at the Sale Hearing does not satisfy Sections 363(f)(1) or (5).**

At the Sale Hearing, the Bankruptcy Court admitted the following evidence pertaining to mechanic's liens against the 29 Lots: (i) a mechanic's lien recorded on

34

September 29, 2022 by Granite Construction Company ("**Granite**") against tax assessor parcel numbers 777-490-042 through 045 (the "**Granite Mechanic's Lien**") (A.72); (ii) a mechanic's lien recorded by H&E Equipment Services, Inc. ("**H&E**") on August 2, 2024 (the "**H&E Mechanic's Lien**," and together with the Granite Mechanic's Lien, the "**Mechanic's Liens**") (A.257); (iii) a Notice of Filing and Perfection of Liens filed by H&E in the Chapter 11 Cases on October 29, 2024 (A.286); and (iv) a mechanic's lien foreclosure complaint filed on June 13, 2024 by RJB Enterprises Inc. d/b/a Ultimate Communications Systems ("**UCS**") against Appellant, among dozens of other defendants (the "**UCS Complaint**") (A.163). As discussed below, none of this evidence, either individually or collectively, satisfies Section 363(f)(1) or (5) with respect to all 29 Lots.[11]

As a threshold matter, there was no evidence admitted at the Sale Hearing that there is any realistic possibility that Granite or H&E could or would foreclose on any of the 29 Lots. (A.1643, Oct. 14 Tr.); (A.1713, Oct. 16 Tr.); (A.1895, Oct 17 Tr.). But more importantly, as explained below, even if they could, there is no evidence that the Mechanic's Liens have priority over the Appellant DOTs.

Under California law, a mechanic's lien has priority over a mortgage "on the work of improvement or the real property on which the work of improvement is

---

[11] Notably, the Sale Order does not reflect that the mechanic's liens satisfy Sections 363(f)(1) or (5).

situated, that (1) attaches after commencement of the work of improvement or (2) was unrecorded at the commencement of the work of improvement and of which the claimant had no notice." Cal. Civ. Code § 8450. Thus, the Mechanic's Liens will have priority over the Appellant DOTs only if the work of improvement commenced before November 28, 2022, when the Appellant DOTs were recorded against the 29 Lots.[12]

Yet there is absolutely no evidence in the record that the work of improvement commenced before November 28, 2022. The only evidence admitted at the Sale Hearing regarding the commencement of the work on the Property was an invoice from Robert Green Residential Inc. dated as of August 31, 2021. (A.1). But according to that invoice, less than 1% of the total project had been completed by that date, and that work consisted entirely of "General Conditions" and "Insurance and Fees." (A.4). At best, the invoice reflects that there was a plan to begin the work of improvement at some unspecified point in the future. Accordingly, there is no evidence in the record that the Mechanic's Liens "relate back" such that they have

---

[12] A "work of improvement" is defined to include "(1) [c]onstruction, alteration, repair, demolition, or removal, in whole or in part, of, or addition to, a building, wharf, bridge, ditch, flume, aqueduct, well, tunnel, fence, machinery, railroad, or road[,] (2) [s]eeding, sodding, or planting of real property for landscaping purposes[, and] (3) [f]illing, leveling, or grading of real property." Importantly, "the work is not considered as having 'commenced' until there is some physical work on the property that is apparent and visible, and the work must be of a permanent nature." *In re Showplace Square Loft Co., LLC*, 289 B.R. 403, 407 (Bankr. N.D. Cal. 2003) (quoting *Miller & Starr* § 11:125 (citing various California cases)). *See also* Cal. Civ. Code § 8050.

36

priority over the Appellant DOTs. As discussed earlier, if the Mechanic's Liens are junior to Appellant's liens, then they cannot satisfy Section 363(f)(1) or (5).

Moreover, the Granite Mechanic's Lien is, on its face, limited to four lots—and therefore cannot possibly satisfy Section 363(f) with respect to all 29 Lots.[13] And the Debtors would have obvious defenses to any action brought to enforce the terms of the H&E Mechanic's Lien because that lien, recorded just days before the Chapter 11 Cases were filed, constitutes an avoidable preference. 11 U.S.C. § 547.

Nor can the UCS Complaint satisfy Sections 363(f)(1) and (5). Like the Mechanic's Liens, there is no evidence that UCS' lien "relates back" such that it is senior to Appellant's first-in-time liens. Moreover, paragraph 11 of that complaint and the attached mechanic's lien both confirm that the relief sought in that complaint is limited to only 8 of the 29 Lots. (A.168, Complaint, ¶ 11); (A.244, Mechanics Lien (identifying the affected property as Tract 37730 Lots 6, 7, 8, 22, 23, 24, 25, and 26 in La Quinta, California)). Thus, at best, the UCS Complaint is evidence that Sections 363(f)(1) and (5) have been satisfied only with respect to those specific lots.

### 3. The Debtors did not satisfy their burden under Section 363(f)(4).

Section 363(f)(4) of the Bankruptcy Code allows the Debtors to sell property free and clear of Appellant's liens if Appellant's interest "is in bona fide dispute."

---

[13] For the avoidance of doubt, there is no evidence that the Granite Mechanic's Lien pertains to any of the 29 Lots.

11 U.S.C. § 363(f)(4). On Exhibit 3 to the Sale Order, the Bankruptcy Court found, with respect to Appellant's liens against each of the 29 Lots, that Section 363(f)(4) was satisfied because of a pending state court mechanics' lien lawsuit that the plaintiff filed to "determine priority associated with [Appellant's] right, title, and interest in the Real Property versus [the mechanic's lien plaintiff]'s right, title and interest in the real property related to the allocation of proceeds from the sale of the Real Property." Importantly, the Bankruptcy Court made no finding in either the Bench Ruling or the Sale Order that such pending lawsuit called into question the validity of Appellant's liens.

But virtually every court that has considered this issue—including cases relied upon by the Debtors—has concluded that a *bona fide* dispute for purposes of Section 363(f)(4) must relate to the <u>validity</u> of the lien at issue. Indeed, Section 363(f)(4) is itself a "codification of long-standing law that allows property to be sold free and clear of a lien if there is a dispute concerning the validity of that lien." *In re Stroud Wholesale, Inc.*, 47 B.R. 999, 1002 (E.D.N.C. 1985). *See also, e.g.*, *In re Revel AC, Inc.*, 802 F.3d 558, 573 (3d Cir. 2015) ("'Bona fide dispute' in the § 363(f)(4) context means that there is an objective basis—either in law or fact—to cast doubt on the **validity** of IDEA's purported lease.") (emphasis added); *In re Southland Royalty Co. LLC*, 623 B.R. 64, 99 (Bankr. D. Del. 2020) (KBO) ("Finally, with respect to section 363(f)(4), this subsection will permit Southland to sell the

38

Wamsutter Assets free and clear of Wamsutter's interests if there is an objective factual or legal dispute as to the **validity** of the interests.") (emphasis added); *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *10 (Bankr. D.N.J. June 29, 2006) ("[C]ourts applying § 363(f)(4) have developed a standard for determining whether a 'bona fide dispute' exists; that is, courts will inquire whether there is an objective basis for either a factual or legal dispute as to the **validity** of the asserted interest.") (emphasis added; internal quotation omitted).

The Debtors cited only two cases—neither of which is from this Circuit—as support for a contrary conclusion. (A.1383-84) But Debtors' reliance on these cases was misplaced. In *Farina*,[14] the court did suggest, in *dicta*, that a dispute as to priority of a lien could provide a basis for a Section 363(f)(4) finding. 9 B.R. at 729. But the issue of priority was not before that court, which ultimately concluded that a creditor's lien was properly perfected and therefore created no *bona fide* dispute. 9 B.R. at 729. And *Elieff*[15] fares no better. In that case, a chapter 7 trustee was able to sell property free and clear where the bankruptcy court had already held that a creditor's liens were mandatorily subordinated under Section 510(b) of the Bankruptcy Code, and the creditor's appeal of that judgment was pending at the time of the sale. 2022 WL 4484597 at *2. When a secured claim is subordinated under

---

[14] *In re Farina*, 9 B.R. 726, 729 (Bankr. D. Me. 1991).

[15] *In re Elieff*, Case No. SA CV 21-1720-DMG, 2022 WL 4484597 (C.D. Cal. Sept. 26, 2022).

39

Section 510(b), it becomes, for all intents and purposes, an equity interest. 11 U.S.C. § 510(b). Thus, the *bona fide* dispute in *Elieff* was not truly about the priority of the secured interest at issue, but rather, whether the secured creditor had any secured claim at all.

The Debtors have attempted to pigeonhole a dispute as to the relative priorities of interests against the 29 Lots into a Section 363(f)(4) issue. But ultimately, they have proven nothing more than that there will be a dispute as to the allocation of the Sale proceeds, which is firmly beyond the purview of this provision. *See Stroud Wholesale* at 1002 ("There is nothing in the Code or in case law to suggest that (f)4 would justify a sale free and clear merely because there is a dispute as to the distribution of the proceeds from the sale.").

Nor can the Debtors rely on a manufactured dispute regarding the avoidability of the Ground Lease to satisfy Section 363(f)(4). (A.2110-13, Debtors' Brief, ¶¶ 16-19). Section 363(f)(4) speaks to *bona fide* disputes. As noted above, section 363(f)(4) requires an "objective basis for either a factual or legal dispute as to the validity of the asserted interest." *In re NJ Affordable Homes Corp.*, 2006 WL 2128624, at *10 (Bankr. D.N.J. June 29, 2006) (internal quotation omitted). There is no objective basis and no evidence from which to conclude that there is *any* dispute as to the avoidability of Appellant's interest in the Ground Lease. There has been no adversary filed, no evidence proffered at the Sale Hearing, and the Debtors have not

40

objected to Appellant's timely filed secured claim. Baseless allegations created for the specific purpose of satisfying Section 363(f)(4) cannot satisfy this provision.

## VI.   CONCLUSION

Appellant respectfully requests that the Court vacate the Sale Order, or, alternatively, strike all findings, conclusions and other provisions therein that (i) the Ground Lease is not a "true lease," and (ii) the Debtors are authorized to sell the Purchased Assets free and clear of Appellant's liens.

Dated: December 19, 2025
     Wilmington, Delaware

*/s/ Shanti M. Katona*
**POLSINELLI PC**
Shanti M. Katona (Del. Bar No. 5352)
Katherine M. Devanney (Del. Bar No. 6356)
Michael V. DiPietro (Del. Bar No. 6781)
222 Delaware Avenue, Suite 1101
Wilmington, Delaware 19801
Telephone: (302) 252-0920
Facsimile: (302) 252-0921
skatona@polsinelli.com
kdevanney@polsinelli.com
mdipietro@polsinelli.com

*Counsel for Appellant Construction Loan*
*Services II, LLC d/b/a Builders Capital*

41

107423518.15

42

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Federal Rule of Bankruptcy Procedure 8015(h) the undersigned certifies that this brief complies with the 13,000-word limitation set forth in Federal Rule of Bankruptcy Procedure 8015(a)(7)(B)(i). As calculated by Microsoft Word, this brief contains 9,390 words, excluding the cover page, table of contents, table of authorities. The brief has been prepared using Microsoft Word. The undersigned has relied upon the word count feature of this word processing software in preparation of this certificate. The above brief also complies with the typeface requirements of Federal Rule of Bankruptcy Procedure 8015(a)(5) and type-style requirements of Federal Rule of Bankruptcy Procedure 8015(a)(6).

*/s/ Shanti M. Katona*
Shanti M. Katona

107423518.15